Steven W. Ritcheson, Esq. (SBN 174062)
**INSIGHT, PLC**
578 Washington Blvd. #503
Marina del Rey, California 90292
Telephone: (818) 744-8714
Facsimile: (818) 337-0383
Email:  switcheson@insightplc.com

Taylor C. Bartlett (pro hac vice to be filed)
Jeanie Sleadd (pro hac vice to be filed)
**HENINGER GARRISON DAVIS, LLC**
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 326-3336
Facsimile:   (205) 326-3332
taylor@hgdlawfirm.com
jeanie@hgdlawfirm.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYON LYMAN. KELLY MCATEER. JASON MERKEL, and MARK VOLK, individually, and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>GENERAL MOTORS LLC,<br><br>        Defendant. | **Case No.: _____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**INJUNCTIVE RELIEF REQUESTED**<br><br>**Jury Trial Demanded** |

COMPLAINT                                    1

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      Plaintiffs Bryon Lyman, Kelly McAteer, Jason Merkel, and Mark Volk (collectively, "Plaintiffs") bring this putative class action complaint against Defendant General Motors LLC ("Defendant" or "GM").

2.      Plaintiffs bring this action individually and on behalf of all others similarly situated and allege upon personal knowledge, information, and belief that Defendant is liable to them and the proposed Class under federal and state law for the design, manufacturing, marketing, and sale of vehicles with defective paint.

3.      The vehicles at issue in this litigation include, but may not be limited to, the 2015-2020 Chevrolet Tahoe, 2015-2020 Chevrolet Suburban, 2015-2020 GMC Yukon, 2015-2020 GMC Yukon XL, and 2015-2020 Cadillac Escalade ("Class Vehicles).

4.      This action is brought to remedy violations of law in connection with Defendant's designing, manufacturing, marketing, advertising, selling, warranting, and servicing of the Class Vehicles. The Class Vehicles were all painted by Defendant, and the paint has a serious latent defect that causes the exterior surfaces of the Class Vehicles to peel, crack, become cloudy, and delaminate without any external or environmental influence.

5.      Defendant knew, or should have known, prior to Plaintiffs' purchases that the paint itself (and any clear coating) was defective, and that its application of the defective paint (and any clear coating) further contributed to the cracking, cloudiness, peeling and delamination. Although the defect manifested over time, Defendant knew or should have known of those issues prior to sale of the Class Vehicles; yet Defendant continued to put the latently defective Class Vehicles on the market.

6.      Defendant breached its express warranty by continuing to sell the defective Class Vehicles and refusing to remedy the issues; instead, it actively concealed them from Plaintiffs and the putative class.

7.      Defendant fraudulently concealed the issues with the paint on the Class Vehicles in violation of state consumer protection laws.

**PARTIES**

8.      Plaintiff Bryon Lyman ("Lyman") is an adult resident and citizen of Riverside County, California.

9.      Plaintiff Kelly McAteer ("McAteer") is an adult resident and citizen of Ventura County, California.

10.      Plaintiff Jason Merkel ("Merkel") is an adult resident and citizen of Orange County, California.

11.      Plaintiff Mark Volk ("Volk") is an adult resident and citizen of Los Angeles County, California.

12.      Defendant is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

13.      Defendant designed, manufactured, marketed, distributed, sold, leased, and warranted the vehicles at issue.  Defendant also developed and disseminated the manuals, warranty booklets, advertisements, and promotional materials relating to the Class Vehicles.  It took those actions to distribute Class Vehicles for sale in California,

purposely availing itself of the laws of that state and accounting for the purchase or lease of the Class Vehicles by the Plaintiffs and Class.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

15.     This Court also has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this case includes claims arising under federal law.

16.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367(a).

17.     This Court has personal jurisdiction over Defendant because it is authorized to do business in this judicial district, conducts substantial business in the judicial district, and some of the actions giving rise to the complaint took place in the judicial district. Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over Defendant permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

**FACTS**

**A. Lyman's Facts**

19.     In 2019, Lyman purchased a used 2017 black Tahoe LT, Vehicle Identification No. 1GNSCBKC1HR181109, from Diamond Chevrolet Buick GMC in Banning, California.

20.     Diamond Chevrolet Buick GMC is an authorized Chevrolet dealership.

21.     At the time Lyman purchased his vehicle, it was used with only 17,000 miles and came with a three year 36,000-mile vehicle bumper to bumper express limited warranty.

22.     One of the main and important reasons for Lyman selecting his Class Vehicle was the paint which Defendant touted extensively to him as superior, of professional grade, and containing a clear coat which protected his vehicle.

23.     Prior to his purchase, Lyman saw Defendant's newspaper, magazine, social media, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality. Plaintiff relied on Defendant's representations in making his purchase.

24.     The warranty Lyman received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

25.     Lyman's Class Vehicle has not been wrecked nor has it been repainted – it has the original paint from Defendant's factory.

26.     Lyman purchased his Class Vehicle for his personal, family, and household use.

27.     His Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

28.     Lyman was particularly careful about his Class Vehicle's paint in that he regularly monitored it for any signs of damage and maintained it properly in accordance with Defendant's recommendations.

29.     Lyman expected his Class Vehicle to be of good and merchantable quality, and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

30.     Lyman first noticed problems with the paint in early-2022.  As part of Lyman's careful and diligent nature concerning his Class Vehicle, upon inspecting his paint Lyman tried the polish the car to fix the problem but was unsuccessful. He then took it to a professional detailer who told him that it was a "clearcoat issue." The detailer buffed the car which made it look better but it was just a "band aid."

31.     The paint continued to get worse showing defects on the roof and hood, as shown below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25    32.    Today, to repair and repaint Plaintiff's Class Vehicle, he would have to

26 pay more than $10,000. Repainting the car would require sanding the vehicle to bare

27 metal and would substantially depreciate the value of the vehicle.  There is no short

28 cut – the Class Vehicles must be sanded and repainted.

COMPLAINT                                    8

33.     The same defective paint and clearcoat was applied to all Class Vehicles.

34.     Lyman's vehicle is just one of tens of thousands of Class Vehicles that suffer from an irreparable defect in the exterior paint that results in peeling, cracking, cloudiness, flaking, bubbling, erosion, and microblistering of the clearcoat.

35.     Lyman expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

36.     Lyman would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

**B. <u>McAteer Facts</u>**

37.     On or about May 1, 2018, McAteer leased a new Black 2018 GMC Yukon XL Denali, VIN: 1GKS1HKJXJR119573, at Silver Star Chevy in Thousand Oaks, California, an authorized GMC dealership. McAteer subsequently purchased the vehicle in 2022.

38.     One of the main and important reasons for McAteer selecting his Class Vehicle was the paint, which Defendant touted extensively as superior, of professional grade, and containing a clear coat which protected the vehicle.

39.     Prior to his lease and purchase, McAteer saw newspaper, magazine, internet, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality. McAteer relied on Defendant's representations in making his purchase.

40.     In 2021, McAteer began noticing that the paint on his car was becoming hazy. He took it to a body shop to have it polished and was told that it needed to be completely repainted because of an issue with the clearcoat. He took his vehicle to an authorized GM dealership so they could fix the paint problem but was told that it was not covered under the warranty. He contacted a GM Brand Regional Manager about

his paint issue. Months later GM offered to cover 20% of the cost to repaint his hood and roof. McAteer did not take them up on this offer because he felt it was unfair.

41.     McAteer's Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

42.     McAteer purchased his Class Vehicle for his personal, family, and household use.

43.     McAteer was always mindful about his Class Vehicle's paint in that he regularly monitored it for any signs of damage and maintained it properly in accordance with Defendant's recommendations.

44.     The following pictures were taken in May 2022 which show the clearcoat degradation defect:





1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



45.     While GM agreed to cover 20% of the cost to repaint the hood and roof of McAteer's Class Vehicle, the remedy is insufficient for at least the following reasons: 1) the new paint would have been only on two sections of the car and not the entire car 2) repainting a car substantially decreases its value, 3) the repainting is done by hand and not by robots in a sterile environment at the factory thus preventing the same finish originally promised, 4) the bumpers would not have been repainted to match which leaves their color different from the repainted metal, 5) McAteer was substantially inconvenienced, and 6) McAteer will be unable to resell his Class Vehicle at fair market value as it will be branded forever as "repainted."

46.     The same defective paint and clearcoat was applied to all Class Vehicles.

47.     McAteer expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective.

48.     McAteer would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

**C. _Merkel Facts_**

49.     In September, 2016, Merkel purchased a new Dark Grey 2016 GMC Yukon XL, VIN 1GKS1GKC4GR395946, at Hardin Buick GMC in Anaheim, California, an authorized GMC dealership.

50.     Merkel has been a loyal GM customer since 1999. Since that time he has purchased four GM vehicles – two Chevy Tahoes, a GMC Acadia, and his 2016 Yukon XL.

51.     At the time Merkel purchased his Yukon, it was new and came with a standard GMC three year, 36,000-mile new vehicle bumper to bumper express limited warranty.

52.     The warranty Merkel received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

53.     One of the main and important reasons for Merkel selecting his Class Vehicle was the paint, which Defendant touted extensively as superior, of professional grade, and containing a clear coat which protected the vehicle.

54.     Prior to his purchase, Merkel saw newspaper, magazine, internet, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality. Merkel relied on Defendant's representations in making his purchase.

55.     In early 2019 when his Class Vehicle had less than 36,000 miles on it, and while his Class Vehicle was still under its new vehicle bumper to bumper express limited warranty, Merkel began noticing issues with the paint on his Class Vehicle. Specifically, his paint was developing a haze underneath the clear coat and the clear coat appeared to be deteriorating on the hood.

56.     As a reasonable car owner and knowing that his new vehicle limited warranty would soon expire, Merkel took his Class Vehicle to a GMC authorized dealer to address his warrantable paint concern and requested repair.  The dealership inspected the paint and he was instructed to make sure to keep wax on his vehicle at all times, which he did. The dealer did nothing further and denied covering the defect under warranty.

57.     At that time, Merkel believed that Defendant, through its authorized dealer, was addressing his warrantable paint concern; but, as known only now, the placing of wax was insufficient as the paint issue was not the result of an environmental or customer caused issue – it was a defect.  Defendant, at that time, knew or should have known of the defect but had not disclosed it to the dealership and Merkel, concealing it, and Defendant knew that placing wax on Merkel's vehicle would not repair the defect.

58.     Slowly over time the paint issues on his hood and roof got worse and worse. Merkel continued to bring this issue to the attention of the GMC dealership.

They eventually offered him $100 towards repainting the hood and roof, the cost of which would be around $3,500.

59.     In 2021 or 2022 the clearcoat degradation on Merkel's vehicle got worse – his hood was almost completely white. He went through the complaint process with GM and reached out to executives at GM about the clearcoat degradation issue on his Yukon. GM has offered to repaint his hood and roof with GM covering 15-20% of the cost.

60.     Merkel's Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

61.     Merkel purchased his Class Vehicle for his personal, family, and household use.

62.     Merkel was always mindful about his Class Vehicle's paint in that he regularly monitored it for any signs of damage and maintained it properly in accordance with Defendant's recommendations.

63.     The following pictures of Merkel's Yukon were taken and provided to GM in May 2022:





1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14



15  64.    While GM agreed to cover 15-20% of the cost to repaint the hood and

16  roof of Merkel's Class Vehicle, the remedy is insufficient for at least the following

17  reasons: 1) the new paint would only be on two sections of the car and not the entire

18  car 2) repainting a car substantially decreases its value, 3) the repainting is done by

19  hand and not by robots in a sterile environment at the factory thus preventing the same

20  finish originally promised, 4) the bumpers would not be repainted to match which

21  leaves their color different from the repainted metal, 5) Merkel was substantially

22  inconvenienced, and 6) Merkel will be unable to resell his Class Vehicle at fair market

23  value as it would be branded forever as "repainted."

24  65.    The same defective paint and clearcoat was applied to all Class Vehicles.

25  66.    Merkel expected his Class Vehicle to be of good and merchantable

26  quality and not defective. He had no reason to know, or expect, that the paint on his

27
28

COMPLAINT                               19

1   Class Vehicle was defective. Had he known these facts, he would not have bought his

2   Class Vehicle or would have paid less for it.

3       67.     Merkel would purchase another vehicle of Defendant if Defendant is

4   ordered to correct its paint defects and to ensure future defects are not concealed.

5       **D. <u>Volk Facts</u>**

6       68.     In 2017, Volk purchased a Charcoal 2017 Cadillac Escalade at Allen

7   Cadillac, now Cadillac of Laguna Niguel, an authorized Cadillac dealership.

8       69.     At the time Volk purchased his vehicle, it was new and came with a

9   standard three year, 36,000-mile new vehicle bumper to bumper express limited

10  warranty.

11      70.     The warranty Volk received is the same as the one each Class Member

12  received, whether they purchased their vehicle directly through Defendant or through

13  a subsequent used-car retailer.

14      71.     One of the main and important reasons for Volk selecting his Class

15  Vehicle was the paint, which Defendant touted extensively as superior, of professional

16  grade, and containing a clear coat which protected the vehicle.

17      72.     Prior to his purchase, Volk saw newspaper, magazine, internet, and

18  television ads touting that the Class Vehicles both new and used were reliable,

19  endurable, of good finish, of high fit, of professional grade, and exceptional quality.

20  Volk relied on Defendant's representations in making his purchase.

21      73.     In early 2020, 32 months into his ownership of the vehicle, when his

22  Class Vehicle had less than 36,000 miles on it, and while his Class Vehicle was still

23  under its new vehicle bumper to bumper express limited warranty, Volk began

24  noticing issues with the paint on his Class Vehicle.  Specifically, his paint was

25  developing a haze underneath the clear coat which looked milky, and the clear coat

26  appeared to be deteriorating.

27      74.     When he first noticed the hazy and milky paint on his vehicle, he thought

28  he just needed to wax the vehicle to get it back to its original state. When that did not

COMPLAINT                                    20

fix the problem, he took his vehicle to Allen Cadillac where he originally purchased the vehicle. Because he took the vehicle to the dealer 6 months after his three-year warranty had expired, the dealership told him they could not do anything because the warranty had expired.

75.     He then took his vehicle to a paint shop that does work for a local GM Buick dealer. The paint shop told Volk the problem was the clearcoat and that this problem was chronic with vehicles like his. They told him they could repaint his vehicle for $1,900, but suggested he take the vehicle back to the dealership to see if the dealership would fix it.

76.     Volk took his vehicle back to the dealership to no avail. He then started communicating with GM via its customer service text messaging system. After exchanging over 50 texts, GM finally agreed to pay a portion of the cost to repaint his vehicle.

77.     Cadillac Pasadena repainted Volk's vehicle. GM paid $1,000 towards the cost of the repair, and Volk paid $1,100 out of his own pocket.

78.     Volk's Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

79.     Volk purchased his Class Vehicle for his personal, family, and household use.

80.     Volk was always mindful about his Class Vehicle's paint in that he regularly monitored it for any signs of damage and maintained it properly in accordance with Defendant's recommendations.

81.     While GM paid short of 50% of the cost to repaint the hood and roof of Volk's Class Vehicle, the remedy is insufficient for at least the following reasons: 1) the new paint is only on two sections of the car and not the entire car 2) repainting a car substantially decreases its value, 3) the repainting is done by hand and not by robots in a sterile environment at the factory thus preventing the same finish originally promised, 4) Volk was substantially inconvenienced, and 5) Volk will be unable to

resell his Class Vehicle at fair market value as it will be branded forever as "repainted."

82.    The same defective paint and clearcoat was applied to all Class Vehicles.

83.    Volk expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

84.    Volk would purchase another vehicle of Defendant if Defendant were ordered to correct its paint defects and to ensure future defects are not concealed.

**E. General Facts**

85.    Plaintiffs and the putative class sought out the Class Vehicles and purchased the Class Vehicles intentionally after seeing and relying on Defendant's promises, warranties, and advertisements.    Each Class Vehicle is a luxury vehicle that comes with a high price tag, and the price is indicative of a vehicle that is superior to others in looks, drivability, fit, and finish.

86.    The condition of the exterior paint on Class Vehicles is an important aspect of their overall value, is considered by first purchasers as well as secondary purchasers, and it often determines whether a car will sell at fair market value or not.

87.    The defects in the Class Vehicles' paint have affected the resale and value of the Class Vehicles.  Defendant recognizes this as it advertises the quality of its paint and offers lower values for cars with paint problems such as those on the Class Vehicles. This is proven by the fact that Defendant seriously discounts its offers for any buybacks or secondary purchases of Class Vehicles.

88.    The defects in the Class Vehicles' paint stem from one of three sources: 1) a defect in the paint itself, 2) a defect in the clear coat, or 3) a defect in the application of the paint and/or clearcoat.  Any or all of these defects will cause the paint and clear coat to microblister, crack, become cloudy, delaminate, peel, fade, and bubble.

89.     Each Class Vehicle was manufactured at a single manufacturing plant, Defendant's Arlington Assembly Plant.

90.     Defendant knew, or should have known, that prior to marketing and selling the Class Vehicles to Plaintiffs and the putative class that the clear coat which is supposed to protect the paint and the Class Vehicle's body, was defective and/or was defectively applied.  The paint and the clear coat were chemically unable to appropriately bond, they were not applied correctly, or one or both products were defective, thereby causing the above-described issues.

91.     Notwithstanding this long-standing problem and extensive knowledge of the issues prior to Plaintiffs' purchases, Defendant continued to advertise and sell the Class Vehicles and failed to issue an appropriate recall. It knowingly failed to provide truthful information about the defects of the paint.

92.     The defects in the paint that Plaintiffs and the putative class are experiencing are not the "Chemical Paint Spotting" noted in Defendant's warranty booklets.  This is because the defect does not manifest itself as "blotchy, ring-shaped discolorations, and/or small irregular dark spots etched into the paint surface."

93.     Defendant benefitted from Plaintiffs' and the putative class's purchases of the Class Vehicles.  For those Plaintiffs and putative class members who purchased new vehicles, Defendant received revenue from the sale.

94.     For those Plaintiffs and putative class members who purchased used vehicles, Defendant received a benefit because the purchases increased the used market prices, thereby allowing Defendant to charge more for its new vehicles.

95.     For each Class Vehicle, Defendant issued an express warranty which covered the vehicle, including but not limited to, the exterior paint, warranting it to be free of defects in materials and workmanship at the time of purchase or lease.

96.     This warranty was a material factor in Plaintiffs' decisions to purchase Class Vehicles.

97.     Pursuant to its express warranties, Defendant warranted the Class Vehicles, including the exterior surfaces, to be free of defects in design, materials, and workmanship, and warranted that repairs or replacements necessary to correct defects in material or workmanship arising during the first 36 months or 36,000 miles, whichever came first, would be made by authorized dealers, without charge.

98.     Defendant breached its warranties for the Class Vehicles as a result of the latent defect with the paint. Despite acknowledging the defect, Defendant breached its warranties by failing to repair the paint as warranted, and otherwise continuing to use the defective paint on its Class Vehicles.

99.     In breach of Defendant's warranties, the Class Vehicles are defective, unfit for the ordinary purposes for which they are intended to be used, and not merchantable.

### Procedural and Substantive Unconscionability of the
### New Vehicle Limited Warranty

100.    Defendant's New Vehicle Limited Warranty time limit is procedurally and substantively unconscionable.

101.    Defendant's New Vehicle Limited Warranty is an adhesion contract because Plaintiffs and the Class are individual consumers and Defendant is a commercial enterprise.

102.    Defendant drafted the New Vehicle Limited Warranty. Plaintiffs and the Class had no part in drafting it.

103.    Plaintiffs, and the Class, are individual consumers who purchased or leased Class Vehicles through Defendant's independent dealer network or from a third party.

104.    In purchasing and leasing negotiations of Class Vehicles, Plaintiffs, the Class, and Defendant never directly interacted and there was never an opportunity for Plaintiffs or the Class to negotiate with Defendant the terms of the New Vehicle Limited Warranty.

105.    The New Vehicle Limited Warranty is presented on a take-it-or-leave-it basis, and if Plaintiffs and the Class sought to purchase or lease a Class Vehicle, they must accept the three year limitation of the New Vehicle Limited Warranty.

106.    In purchasing or leasing Class Vehicles, Plaintiffs and the Class interacted only with Defendant's authorized dealers or third parties.  Those dealers and third parties have no authority to modify the terms of the New Vehicle Limited Warranty thus precluding any negotiations of any sort between Plaintiffs and the Class with Defendant over its terms.

107.    Defendant's authorized dealers and third parties were never informed by Defendant of the latent paint defect and thus could never have informed Plaintiffs and the Class that the three-year time limit of the New Vehicle Limited Warranty would expire prior to the latent paint defect manifesting.  Thus, no one involved in the actual sale or lease of a Class Vehicle had knowledge of the latent paint defect, which bolstered Defendant's unreasonable knowledge advantage.

108.    At the time the Plaintiffs, and the Class, purchased or leased their Class Vehicles, they were unaware of the latent paint defect, yet Defendant was aware of it, *see infra* ¶¶102-127 & 135-153, thereby creating unequal bargaining power because Defendant knew of the latent defect, but the Plaintiffs and the Class did not and could not have known of it.

109.    Defendant's failure to communicate with dealerships and customers is an example of active and willful concealment.

110.    At the time of the sale or lease of the Class Vehicles, Defendant had unfair bargaining power because it knew that the three year time limit would expire prior to the latent paint defect manifesting itself.

111.    Because only Defendant was aware of the latent paint defect's manifestation, and Defendant limited the New Vehicle Limited Warranty to three years it had an unjust and undeserved advantage when the Plaintiffs and Class purchased or leased Class Vehicles.

112.    Plaintiffs, and the Class, lacked any meaningful choice in accepting the time limit of the warranty and had no ability to negotiate its natural length.  In fact, Plaintiffs and the Class either had to take the warranty as written by Defendant or decline to purchase their Class Vehicle.

113.    Had Plaintiffs and the Class known that the latent paint defect would not manifest until years after purchase, and Defendant had provided a way to negotiate its length, then Plaintiffs and the Class would have demanded a longer warranty period such that the latent paint defect would have manifested prior to the natural expiration of the New Vehicle Limited Warranty.

### **Defendant's Marketing and Concealment**

114.    Defendant knowingly manufactured and sold the Class Vehicles with the paint defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' exterior paint.

115.    Defendant directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, mailings, and through other mass media, including to Plaintiffs.

116.    Defendant's marketing material describes the various Class Vehicles as "the best SUV," "awesome," "luxurious," "professional grade," and "the one that performs." Defendant's slogan for the Class Vehicles was "the new premium."

117.    Defendant itself has recognized the importance of the quality of paint used on its Class Vehicles. Defendant specifically identifies paint as being a covered warranty item in its warranty booklet and acknowledges that defects are "normally corrected during the new vehicle preparation."

118.    Here, for the Class Vehicles, the paint defect was not corrected during the new vehicle preparation.

119.    Although Defendant knew of the clear coat's propensity to peel, become cloudy, crack, blister, flake, delaminate, and bubble on Class Vehicles, it failed to notify Plaintiffs and Class Members of this prior to their purchase.

120.    When Plaintiffs purchased their vehicles, they relied upon representations of Defendant that the cars had been inspected and any paint defects were "taken care of" prior to placing the vehicles on the market.

121.    As a result, each Plaintiff expected that the paint and application process used on the Class Vehicles would not cause its clearcoat to peel, become cloudy, crack, flake, delaminate, or bubble under normal conditions, and cause other problems that would negatively impact the value of the Class Vehicles.

122.    Plaintiffs and the putative class were exposed to Defendant's pervasive, long-term, national, multimedia marketing campaign touting the supposed quality and durability of the Class Vehicles and their component parts, including paint, and they justifiably made their decisions to purchase their Class Vehicles based on Defendant's misleading marketing that concealed the true, defective nature of the paint used on the Class Vehicles.

123.    Plaintiffs and Class, in deciding to purchase the Class Vehicles, relied upon Defendant to inform the public and potential purchasers of any defects in the Class Vehicles, including defects in the paint.

124.    Defendant failed to inform Plaintiffs and Class of the defect with the paint, and Plaintiffs and Class would not have purchased the vehicles had they known of the defects in the paint, or they would have paid a much lower price for the vehicles had they known of the defect.

**A.    Defendant Knew of the Paint Defect Prior to Sale or Lease of the Class Vehicles Yet Concealed Its Knowledge.**

125.    Defendant was aware of irreparable defects with the paint and clear coat used on Class Vehicles. Defendant was aware of these defects at the time it advertised and sold the Class Vehicles and thereafter when it continued to disseminate

information about the vehicles for those Plaintiffs and putative class members who purchased their Class Vehicles on the secondary market.

126.    At those times, the defects with the paint and clearcoat that Defendant knew about, or should have known about, included -- but were not limited to -- defects in the manufacture, process, materials, and workmanship of the vehicle.  Defendant failed to inform Plaintiffs and the putative class about the defects, and the defects have rendered the vehicle unmerchantable.

127.    Prior to a new paint and/or paint system being used on a vehicle, automakers such as Defendant are known to employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. In addition to extensive exterior and accelerated weathering evaluation of clearcoats, there is additional aggressive testing prior to the qualification of an automotive coating system to ensure the paint system will provide long lasting protection when exposed to environmental elements. These tests often run over the course of two-to-five years before a vehicle using the paint system is brought to market.

128.    Most of these test procedures are developed and standardized by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

      a.  accelerated weathering tests to assess paint color, gloss retention, and appearance in general, such as Xenon Arc (subjecting test panels to intense radiation), QUV (subjecting test panels to high ultra-violet light and condensing humidity cycles), EMMAQUA (placing test panels on racks that rotate with the sun to provide maximum UV light exposure), and humidity tests (subjecting test panels to 100% relative humidity at 100°F for several weeks);

      b.  long-term outdoor weathering tests, where test panels are placed on so called "test fences" at 45-degrees facing south (according to ASTM

standards) in various environments, such as Florida (high UV light, humidity, and salt spray), Arizona (intense UV light and temperature), and industrial sites (high pollutants such as acid rain and various chemicals);

c. corrosion resistance tests, including salt spray (subjecting test panels to 5 wt. salt spray at 95°F for several weeks), cyclic corrosion (subjecting test panels to various cycles of salt spray, humidity, wet/dry, temperature), condensing humidity (subjecting test panels to temperature cycling in highly saturated air, CASS (subjecting test panels to salt spray with added acetic acid for accelerated testing), and Kesternich (subjecting test panels to acid rain simulation);

d. physical and mechanical tests, including flexibility, impact resistance, abrasion resistance, scratch and mar resistance, coating thickness, adhesion, and hot and cold cycling; and

e. chemical properties testing, including resistance to solvents, chemicals, and various fluids the vehicle will likely encounter in the open environment.

129.    In addition, Defendant did or should have performed several of the above-described ASTM and SAE test procedures.

130.    Defendant has developed and publicized what is referred to as "GM SAE Standards & Testing" that are used in connection with the testing of its vehicles, including GM 4350M for a test relating to the "Painted Part Performance Requirement," GM 9200P "Accelerated Aging and Steaming," GM 9505P "Automotive Environmental Cycles," GM 9540P "Accelerated Corrosion Test," GMW 14669 "Organic Coating/Finish Performance for Exterior and Interior Metallic Materials," as well as various other tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in simulated real-world conditions. Applied Technical Services, GM SAE Standards & Testing, https://atslab.com/wp-

content/uploads/2019/03/GM-SAE-Automotive-Spec-Combined.pdf    (last    visited
February 11, 2022).

131.    The development of the paint and the paint system, including the testing
performed in connection therewith, would have revealed the paint defect.

132.    If Defendants conducted the proper standard testing, the defects would
have become apparent to Defendant because these tests are designed to accelerate the
normal aging process of vehicles such that during these tests Defendants would have
discovered in a short period of time that the paint was defective.

133.    If Defendant actually conducted these standard tests, Defendant would
have been put on notice of the defect and because it did not disclose the defect to
Plaintiffs and the putative class it must have actively concealed it.

134.    If Defendant did not conduct these standard tests, it did so knowing that
it was against its own procedures and industry standards.

135.    On information and belief, prior to the manufacture and sale of the Class
Vehicles, Defendant knew of the paint defect through, or as evidenced by, sources
such as pre-release design and testing information; technical service bulletins; service
center data; early consumer complaints made directly to Defendant, collected by
NHTSA ODI, and/or posted on public online vehicle owner forums; testing done,
including testing in response to consumer complaints; aggregate data from
Defendant's dealers; and other internal sources unavailable to Plaintiffs and Class
without discovery.

136.    Defendant monitors public online vehicle owner forums and responds to
putative class member complaints and at least for www.chevroletforum.com, they
have done so since at least 2010 and in approximately four years from 2010 to 2014,
Defendant made 4,167 posts!  Their last activity on www.chevroletforum.com was
April    14,    2021.        https://chevroletforum.com/forum/tahoe-suburban-diy-useful-
threads-61/paint-peeling-off-2012-suburban-gm-said-not-under-warranty-60366/

COMPLAINT                                30

137.    Defendant also monitors YouTube videos, like the one below, and posts information on YouTube since at least 2006. https://www.youtube.com/c/Chevrolet/about





| July 24th, 2014, 9:52 AM | #10 |
|---|---|
| **Chevrolet Customer Service**<br>**Official GM Rep**<br><br>Join Date: Mar 2010<br>Location: Global Headquarters in Detroit, MI<br>Posts: 4,167<br>Likes: 0<br>Received 18 Likes on 16 Posts | Hello,<br><br>We do apologize for the frustrations you have experienced. You are welcome to send us your name, address, phone number, VIN, mileage, and name of preferred dealership through a private message; however, we cannot guarantee that cost assistance will be provided for repairs due to the age of the vehicle.<br><br>Jessica<br>Chevrolet Customer Care |

# Chevrolet Customer Service

**Official GM Rep**



Send Message ▾

Last Activity: April 14th, 2021 4:31 PM



| About Me | Statistics | Social Profiles | Friends |
|---|---|---|---|

**About Chevrolet Customer Service**

**Location**
Global Headquarters in Detroit, MI

**Vehicle(s)**
GM vehicles

**Occupation**
Chevrolet Customer Care Team

**Signature**
Check out the NEW Owner Center at: My.Chevrolet.com

For information on the GM Privacy Statement, please visit http://www.gm.com/privacy-statement.html

COMPLAINT                    32

**B.     Prior to the Natural Expiration of Plaintiffs' Limited Warranty, Defendant Knew that the Arlington Assembly Paint Process Was Flawed Yet Continued to Conceal It For More than Six Years.**

138.   Defendant actively and willfully concealed the paint defect precluding Plaintiffs from bringing any claim against it until more than four years after their purchases.

139.   Indeed, as of the natural termination of the New Vehicle Limited Warranty, Lyman's Class Vehicle had yet to manifest the paint defect and thus without knowledge of the defect, could not bring a cause of action against Defendant.

140.   While Defendant knew of the paint defect, it failed to inform internal paint experts and its paint supplier, actively concealing from them and the public.

**C.     Defendant Knew that Paint Defects Were Prevalent in Their Vehicles.**

141.   Defendant also knew or should have known about the potential for paint defects based upon complaints made on the prior version of the Chevrolet Suburban:

a.  9/2/2013: "Paint peeling off of 2012 Suburban and GM said not under warranty: Purchased a new 2012 Suburban off of the dealers lot this past February while we were in Florida… I now have about 5200 miles on it. It is garage kept here in IL… Paint just peeled off the plastic panel in a 3" diameter circle. I saved the pieces to show my Chevy dealer here in IL… we ran our hands over the paint and it has a ripple in it… I was told it was not warranty work. But they would not put that in the computer and print it our for me. I called GM Care at least 15 times before they returned my call."     https://chevroletforum.com/forum/tahoe-suburban-diy-useful-threads-61/paint-peeling-off-2012-suburban-gm-said-not-under-warranty-60366/

b.  9/4/2013: "GMC paint problem: GM has had a problem with the hood and roof paint flaking for years. I thought I would publish this video to

demonstrate how poor the response is from GM to fix problems. The instrument panels in the Yukon, the Silverado and many others is another demonstration of the pathetic service that GM delivers. They purposely wait for the average consumer to drive past the mileage cap before they offer a recall or a solution to the problem they have known about for some time. This is the way that you repay the taxpayers who bailed you out? Shame on you GM! You are an embarrassment to American made products!" https://www.youtube.com/watch?v=HdFuzNyXwt8

**D.** **Defendant Knew of the Paint Defect from Class Member Complaints Made Directly to Defendant as Well As Posted Online.**

142. Defendant also knew or should have known about the paint defect based on complaints made directly to Defendant. The large number of complaints, and the consistency of their descriptions of peeling, cracking, becoming cloudy, blistering, flaking, delaminating, and bubbling caused by the defective paint and/or clear coat, alerted or should have alerted Defendant to this substantial defect affecting a wide range of its vehicles.

143. However, many Class Vehicle owners complained directly to Defendant and Defendant's authorized dealerships about the paint issues they experienced. The number and consistency of these complaints should have alerted Defendant to the existence of the paint defect and some of these are reproduced below:

- 10/20/2020: "2015 Chevrolet Tahoe: ~tl- the contact owns a 2015 Chevrolet Tahoe. The contact stated that the paint on the engine hood is peeling off. The vehicle was taken to local dealer camino real Chevrolet (2401 s atlantic blvd, monterey park, CA 91754 (323) 264-3050) where it was not diagnosed. The manufacturer had not been informed of failure. The failure mileage was approximately                              69,000.                              Dl." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php
- 5/1/2020: "2016 Chevrolet Tahoe: I have a 2016 Tahoe that I purchased new from dealer. I had also purchased a protection plan with finishing touch that they talked us into when we bought the car on the paint and interior. 3. 5 years

into ownership the paint on the hood and roof faded. We contacted the protection plan and they were more than willing to take care of. They sent an adjuster out and he classified as clear coat failure. Then the run around started. I contacted Chevrolet and I contacted the dealership. We took the car to the dealership and talked with the assistant manager in the service department. He brought out the manager and he confirmed that it was paint failure. So then the dealership gets involved with Chevrolet. The first call comes back and says they will cover 20%. I told them that some one was going to cover the repairs and it won't be me. They sold me a protection plan through finishing touch for the paint and the interior so someone needs to cover the damage. After a few days I get a call stating that between the dealership, Chevrolet and finishing touch it would be repaired at no cost. � now it gets better. We took the vehicle back to the dealership to have the hood and the roof repainted. After a week at the body shop the car is ready to be picked up. We walk up to the car and it is all shiny and looking good. But the color doesn't match. We call the service manager out and he says he can't see the issue. The Tahoe is a brownstone metallic and the hood is more bronze than the rest of the vehicle. He tells me he can get the paint manager to come speak to me because he can't see the problem. This is a overcast day so it doesn't show really bright but my husband and I can see the difference. While we are waiting for the manager from the body shop to arrive we walk around the vehicle. Dealership states Chevrolet will not blend the paint to match." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 11/1/2018: "2016 Chevrolet Tahoe: The exterior paint starting fading, clear coat not holding up." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 1/6/2019: "We purchased a certified pre-owned 2015 Suburban at the end of last year. It was shiny and pristine at the dealership. Within two months of having it home, we notice the paint on the hood and roof looked dull and like the paint was swirled. We had it detailed and were advised by the detailer that he felt the paint was defective.  The vehicle had approx 30,000 miles on it when we bought it.  While we didn't expect it to be 100% unblemished, we never expected the paint on the hood and roof to completely fail.  It was disguised with wax apparently when it was on the lot.

COMPLAINT                                    35

Since then, we have been in touch with the dealership that sold us the vehicle, GM corporate, and our local dealership. The dealership where we purchased the vehicle has told us that they will do nothing to assist us. This was in January of this year, well before the warranty was up, not even two months after we purchased it.   We do not feel this is a warranty issue anyway but rather a defect."    https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 9/30/2019: "Our 2015 Suburban is doing the exact same thing, we are getting a run around.  Chevy says it not their problem/fault, our dealer said to go to Chevy.  Chevy corporate online said to go to the local dealer, the polyshield we had put on doesn't cover the paint "cracking".  So we are where you are, what did you do and how did you get it fixed.  We are going to go get estimates at auto shops next week."    https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 10/11/2019: "I just emailed the person in the original post about this. My 2015 Yukon is doing the same thing and looks like a 20 year old car. We are getting the same responses from our dealership and GM. We have got to get something done about this! These $70K vehicles should not be doing this!!!!"    https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 11/4/2019: "I have the same paint issue on a 2014 Yukon.  Its been like this for some time.  About 18 months ago I have the dealer look at it.  They and GMC declined    to    do    anything    about    it."    https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 8/1/2018" The coups de gras, which was the final straw is when the top coat on the hood and top of Tahoe started to fade/grey and crack on the black undercoat. To fix the top coat, the dealership wanted $2300.00; of which they were going to pick up 10% of after my pushing for warranty. The Tahoe is 3 years old. The paint should last well into a decade, and I kept the car washed weekly and detailed every 6 months. This expense after all the cost for the AC repairs and replacement cost for several external brackets and trim that broke within 3 years."
  https://www.carcomplaints.com/Chevrolet/Tahoe/2015/body_paint/clear_coat_fading_and_cracking.shtml

- 6/12/2018: "I've started to develop more of the Clear Coat Peeling on the rear drivers side of the bed. This time, I'm calling the 800 number and I'm gonna open a support ticket. I'm fearful of the longevity of the paint. I feel like I'm getting screwed. I love my '17 but I hate the cosmetic issues it has been developing. I've got 10k miles left to the 36k miles and I'm not even in the second year owning the truck yet." https://www.gm-trucks.com/forums/topic/212696-peeling-clear-coat/

144.   Further, knowledge of the defect is evidenced by recognition of an issue with the paint by each Defendant employee Plaintiffs spoke with about their vehicle's paint issues when they complained directly to Defendant.

145.   As shown by this small sampling of complaints from forums and websites such as www.carproblemzoo.com, www.carcomplaints.com, www.gm-trucks.com, and www.tahoeyukonforum.com, consumers have been vocal in complaining about the paint defect and the damage it has caused.  A multi-billion dollar vehicle design and manufacturing company such as Defendant undoubtedly tracks and has tracked such sites and was aware or should reasonably have been aware of the paint defect in the Class Vehicles.

146.   In sum, Defendant has actively concealed the existence and nature of the paint defects from Plaintiffs and the putative class since at least 2014 (and certainly before the date that Plaintiffs purchased their Class Vehicles) despite its knowledge of the existence and pervasiveness of the paint defect, and certainly well before Plaintiffs and the putative class purchased their Class Vehicles.

147.   Specifically, Defendant has:

a. failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the paint defect;

b. failed to disclose, at and after the time of purchase, lease, and/or service, that the paint and paint process used on the Class Vehicles were defective and not fit for their intended purposes;

c. failed to disclose, and actively concealed, the fact that the paint and/or the paint process used on the Class Vehicles were defective, despite the fact that Defendant learned of the paint defect as early as 2014, and likely even earlier;

d. failed to disclose, and actively concealed, the existence and pervasiveness of the paint defect even when directly asked about it by Class members during communications with Defendant, Defendant Customer Assistance, Defendant's authorized dealerships, and Defendant's authorized service centers;

e. actively concealed the paint defect by forcing Class members to bear the cost of repainting, while at the same time performing those services at no (or lower) cost for those who complained vocally and often;

f. actively concealed the paint defect by inadequately repainting the Class Vehicles, so that the paint defect has never been permanently corrected in the Class Vehicles, even though Plaintiffs and the putative class were led to believe that the services would cure, and, in fact, had cured the paint defect in their Class Vehicles;

g. actively concealed the paint defect by knowingly repainting the Class Vehicles with the same paint, clear coat, and paint process, while knowing and concealing that repainting the Class Vehicles would not prevent and/or cure the problems associated with the paint defect because the paint used on the Class Vehicles remained defectively designed; and

h. actively concealed the paint defect by knowingly repainting the Class Vehicles with defective paint using the same paint process, while knowing and concealing that repainting the Vehicles would not prevent and/or cure the problems associated with the paint defect because the process by which the paint was applied to the Class Vehicles remained defective.

**E.**   **Defendant Knew of the Paint Defect from Repair Data.**

148.   Defendant also knew or should have known about the paint defect because of the large number of repainting and repair jobs it performed on Class Vehicles due to peeling, cracking, becoming cloudy, blistering, delaminating, and bubbling.

149.   Defendant collects, reviews, and analyzes detailed information about repairs made on vehicles at its dealerships and service centers, including the type and frequency of such repairs. This information was produced and is referenced *supra*.

### INADEQUATE REMEDY

150.   As evidenced by the experiences of Plaintiffs and the estimates they have received after their Class Vehicles experienced the paint defects, repainting the Class Vehicles (when and if Defendant agrees to do so), even if done properly, does not cure the paint defect and does not remedy the diminution of value that occurs as a result of the repainting.

151.   For all the Class Vehicles, the factory paint was supposed to be applied by robots to exacting tolerances consistently over all body panels—a point highlighted by Defendant when marketing the Class Vehicles to customers—whereas Defendant's repair process is haphazard at best and results in paint inconsistencies relative to appearance and longevity.

152.   Indeed, the repainting of a Class Vehicle at numerous local repair shops could never achieve the same finish that is produced during the original painting of it given the equipment and methods used by Defendant in the paint system that is applied to the pristine body of a Class Vehicle, not to mention the pristine and strictly controlled environment in which the paint system is applied.

153.   The environment in which the Class Vehicles are repaired, and the limitations of body shops, including those who are certified by Defendant, all but assures that the quality of re-painting can never be as good as the original paint job. Defendant knew that the repair procedures were inadequate at the time they were first

implemented, especially in light of the environmental and technical limitations of the body shops it authorized to perform such repairs, yet concealed that fact from Plaintiffs and the putative class.

154.    Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, especially from a luxury brand like Defendant, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price.

155.    In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to the Class Vehicle that are being hidden, not to mention rust.

156.    According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage. In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following in order to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.

157.    Paint work to a vehicle typically shows up on a CARFAX Vehicle History Report, as such repairs are often reported by the dealerships or body shops performing them. Even if it is not, paint work can easily be identified through the use of a paint meter, which are used by dealers when evaluating vehicles for trade-in purposes. In the case of the Class Vehicles, given the nature of the paint defect and

the inadequate repainting of the Class Vehicles, the paint work can be identified by potential buyers with the naked eye and without the use of a paint meter.

158.    Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle. KBB divides the condition of used vehicles into the following four grades:

> **Excellent** condition means that the ***vehicle looks new***, is in excellent mechanical condition and needs no reconditioning. ***This vehicle has never had any paint or body work*** and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

> **Good** condition means that the vehicle is ***free of any major defects***. This vehicle has a clean Title History, the paint, ***body and interior have only minor (if any) blemishes***, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

> **Fair** condition means that the ***vehicle has some*** mechanical or ***cosmetic defects*** and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, ***the paint, body*** and/or interior ***need work performed by a professional***. The tires may need to be replaced. There may be some repairable rust damage.

> **Poor** condition means that the ***vehicle has severe*** mechanical and/or ***cosmetic defects*** and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

159.     According to KBB's online Condition Quiz, vehicles that have extensive paintwork and no paint damage are considered to be, at most, in "Good" condition, while vehicles that have no paintwork and extensive paint damage are considered to be, at most, in "Fair" condition.

## PLAINTIFFS WERE DAMAGED BY THE PAINT DEFECT

160.     Plaintiffs and the putative class purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Class Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Defendant were not those for which Plaintiffs and the putative class bargained. Rather, the Class Vehicles suffered from a common defect – the paint defect. Had Plaintiffs and the putative class known of the paint defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

161.     As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and the putative class suffered economic harm.

162.     This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiffs and the putative class would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have been repainted and those that have not.

163.     Plaintiffs and the putative class paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by Defendant. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Paint Defect. Plaintiffs and

the putative class were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

164.    As a direct result of Defendant's misrepresentations and omissions, Plaintiffs and the putative class overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and the putative class paid a premium for the Class Vehicles, which Defendant advertised as being durable and of high-quality, and received Class Vehicles that contained a known but concealed defect. Defendant was unjustly enriched because it obtained and retained monies paid by Plaintiffs and the putative class who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

165.    In addition, the widespread disclosure of the paint defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and the putative class have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Paint Defect has not yet manifested.

166.    As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Paint Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

167.    Plaintiffs and the other Class members were injured as a result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value, whether they are re-painted or not. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

## ADDITIONAL FRAUDULENT CONCEALMENT FACTS DETAILED

168.    Defendant owed a duty to Plaintiffs and the putative class to disclose to them what was known about the paint defects as soon as they were known.  Defendant

knew that Plaintiffs and the putative class chose Defendant's brand intentionally and for the purpose of displaying their luxury vehicles.  Because of the particular nature of Plaintiffs and the putative class who affirmatively chose Defendant's brand, Defendant was on notice that the Plaintiffs and the putative class expected certain qualities from the paint.

169.    Plaintiffs' claims arise out of Defendant's fraudulent active and willful concealment of the paint defect and Defendant's representations about the quality, durability, and value of the Class Vehicles, including the paint used on the Class Vehicles.

170.    To the extent that Plaintiffs' claims arise from Defendant's fraudulent concealment, there is not one document or communication, and not one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, Defendant knew, or was reckless in not knowing, of the paint defect; Defendant was under a duty to disclose the paint defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Defendant never disclosed the paint defect to Plaintiffs or the public at any time or place or in any manner.

171.    Plaintiffs make the following specific fraud allegations with as much specificity as possible although they do not have access to all the information necessarily available only to Defendant as discovery is ongoing:

a. ***Who***: Defendant actively concealed the paint defect from Plaintiffs and the putative class while simultaneously touting the quality and durability of the Class Vehicles, as alleged, *supra*.

b. ***What***: Defendant knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the paint defect, as alleged, *supra*. Defendant concealed the paint defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as alleged, *supra*.

COMPLAINT                                           44

c. ***When***: Defendant actively and willfully concealed material information regarding the paint defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2014, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged, *supra*. Defendant has not disclosed the truth about the paint defect in the Class Vehicles to anyone outside of Defendant. Defendant has never taken any action to inform consumers, and has actively and willfully concealed, about the true nature of the paint defect in Class Vehicles. And when consumers brought their Class Vehicles to Defendant complaining of the clearcoat peeling, cracking, becoming cloudy, flaking, delaminating, or bubbling off of their Class Vehicles, Defendant denied any knowledge of, or responsibility for, the paint defect, and in many instances, actually blamed owners/lessees for causing the problem.

d. ***Where***: Defendant concealed material information regarding the true nature of the paint defect in every communication it had with Plaintiffs and the putative class and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Defendant disclosed the truth about the paint defect in the Class Vehicles to anyone outside of Defendant. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Defendant's website.

e. ***How***: Defendant concealed the paint defect from Plaintiffs and the putative class and made representations about the quality and durability of the Class Vehicles. Defendant actively concealed the truth about the existence and nature of the paint defect from Plaintiffs and the putative class at all times, even though it knew about the paint defect and knew that information about the paint defect

would be important to a reasonable consumer, and Defendant promised in its marketing materials that the Class Vehicles have qualities that they do not have.

f. **Why**: Defendant actively concealed material information about the paint defect in Class Vehicles for the purpose of inducing Plaintiffs and the putative class to purchase or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and durability of the Class Vehicles. Had Defendant disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

172.     Had Defendant disclosed the paint defects to Plaintiffs and the putative class, they would not have been damaged, as alleged *supra*, as they would not have purchased or leased their Class Vehicles.  Each Plaintiff and the putative class, because of the nature of the Class Vehicles as luxury and special vehicles, would have been in a position, whether via advertising, marketing, research or otherwise to have learned of Defendant's disclosures concerning the paint defects.

173.     Further, had Defendant disclosed the paint defects, the asking price or sticker price of the Class Vehicles would have been considerably less than other Defendant cars of similar vintage and mileage which did not suffer from the paint defect thereby putting Plaintiffs and the putative class in a position to learn of the paint defect prior to purchase or lease.  The Class Vehicles would also have been less than comparable competitors' cars thereby putting Plaintiffs and the putative class in a position to learn of the paint defect prior to purchase or lease.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

174.     Defendant, until March 7, 2023, actively, willfully, and successfully concealed Plaintiffs' right to bring suit against it by publicly claiming that Plaintiffs had no damage and that the paint issue they experienced was the Plaintiffs' fault.

175.     Defendant concealed this all the while knowing that the paint defect did not manifest itself until years after manufacturing, allowing Defendant to escape liability by arguing that a four year statute of limitations period applies to Plaintiffs' claims.

176.     Defendant knowingly and intentionally waited until more than four years after manufacturing to admit this so as to preclude Plaintiffs from bringing their causes of action.

177.     As shown *supra*, Defendant knew of the paint defect, yet took affirmative steps to conceal it from Plaintiffs and the Class thereby precluding them from bringing a claim against Defendant.

178.     Defendant was deceitful and fraudulent, as shown *supra*, because it took affirmative steps to conceal the defect and cause of action from Plaintiffs and the Class in an effort to escape liability.

179.     Disclosure of the defect by the Defendant would have undermined its marketing goal to sell as many Class Vehicles as possible.  This marketing and promotional campaign was underway during the time that the defect was concealed. This shows, circumstantially at least, that Defendant's concealed this information to protect its sales and that it did so actively and willfully.

180.     Defendant maintained this active and willful concealment for more than eight years.

181.     Indeed, it was not until the March 7, 2023, deposition of Ms. Hodapp and the March 16, 2023, deposition of Mr. Dziatczak that Defendant first revealed to Plaintiffs' their causes of action, but Defendant still has not publicly revealed them.

182.     Defendant has repeatedly and continues to blame Plaintiffs and the Class for some type of "environmental" exposure or customer neglect.  By making Plaintiffs and the Class believe the paint issues were their fault, Defendant actively and fraudulently prevented Plaintiffs and the Class from determining the existence of their causes of action.

COMPLAINT                                          47

183.    Plaintiffs and the Class, as reasonable consumers, were careful in the maintenance of their paint, properly stored their Class vehicles, and routinely monitored their Class Vehicles for paint issues.

184.    Indeed, Plaintiffs were diligent in their investigations of their paint issues but were stymied by Defendant's concealment and active false statements – such as the paint issues were due to Plaintiffs' neglect, that outside "environmental" factors caused the paint issues, or that waxing their vehicle would fix the problem.

## CLASS ACTION ALLEGATIONS

185.    Plaintiffs bring this action on behalf of themselves, and others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23. The Class which Plaintiffs seek to represent is composed of and defined as (collectively "Class"):

    a.  All consumers who purchased or leased a Class Vehicle in California, inclusive of all such consumers residing anywhere in the United States;

186.    The following persons are excluded from the definition of the Class:

    a.  U.S. District Court judges, magistrate judges of any U.S. District Court, judges of the U.S. Court of Appeals for the Ninth Circuit, and U.S. District Court personnel having any involvement with administration and/or adjudication of this lawsuit;

    b.  Special equipment optioned vehicles;

    c.  Consumers who own or leased Class Vehicles whose paint issues were not on the hood and/or roof;

    d.  Class counsel and their employees; and

    e.  Employees of Defendant.

187.    This action has been brought and may properly be maintained as a Class action pursuant to the provisions of the Federal Rules of Civil Procedure, for these reasons:

a. Members of the Class are geographically distributed throughout the United States and exceed 1,000 in total so that their joinder is impractical; and

b. Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.

c. Plaintiffs' claims are typical of the claims of the members of the Class under Federal Rule of Civil Procedure 23. Each member of the Class either owns, owned, leases, or leased a Class Vehicle.

d. Plaintiffs will fairly and adequately protect the interest of the Class as required by Federal Rule of Civil Procedure 23. Plaintiffs have no interests which are adverse to the interest of the Class. They have retained counsel who has substantial experience in the prosecution of Class actions.

e. The prosecution of separate actions by individual members of the Class would create the risk of (i) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendant; or (ii) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

f. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and Class, causing injury to them and making Class-wide relief appropriate, specifically declaratory and injunctive relief.

g. The questions of law or fact common to the Class predominate over questions affecting only individual members. A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy under Federal Rule of Civil Procedure 23. The harm suffered by many individual members of the Class may not be great enough to

warrant the expense and burden of individual litigation, which would make it difficult or impossible for individual members of the Class to redress the wrongs done to them. Individualized litigation would also present the potential for inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of the complex factual issues of the case. By contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each Class member.

## COUNT ONE
### (Breach of Express Warranty)

188. Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

189. For each Class Vehicle, an express written warranty was issued that covered the vehicle, including but not limited to the exterior paint, and warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

190. The warranties listed above formed the basis of the bargain with regard to Plaintiffs' and Class Members' purchase and lease of the Class Vehicles.

191. Each Plaintiff gave notice to Defendant of breach of warranty and demanded repair of the paint defect.

192. Defendant breached its warranties by offering for sale and selling defective vehicles, specifically vehicles with paint that was defective and was defectively applied, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

193. Defendant further issued an express written warranty to the original owner, and each subsequent owner, that Defendant would make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period, without cost.

194.    Defendant breached its warranties by refusing to repair or repaint the Class Vehicles for latent defects which arose during the warranty period or refusing to do so without charge to the owners.

195.    Defendant's breach of its express warranties proximately caused the Class to suffer damages in excess of $5,000,000.00.

196.    Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled.

## COUNT TWO
### (Breach of Implied Warranty of Merchantability, Cal. Com. Code §§ 2314 and 10212)

197.    Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

198.    California law conferred an implied warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which they were to be used pursuant to Cal. Com. Code §§ 2314 and 10212.

199.    The Class Vehicles were not merchantable, and as such Defendant breached its implied warranties because at the time of sale and all times thereafter the Class Vehicles would not pass without objection in the automotive trade given the clearcoat degradation defect.

200.    Each Plaintiff gave notice to Defendant of breach of implied warranty and demanded repair of the paint defect.

201.    Defendant's breach of its implied warranties proximately caused the Class to suffer damages in excess of $5,000,000.00.

202.    Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled.

## COUNT THREE
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)

203.    Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

204.    For each Class Vehicle, Defendant issued an express written warranty that covered the vehicle, including but not limited to the exterior surfaces, and warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

205.    Defendant breached its express warranties by offering for sale and selling defective vehicles that contained paint that was defective and was defectively applied, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

206.    Plaintiffs and members of the Classes are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

207.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

208.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

209.    Defendant's express warranties relate to the future performance of its vehicles because it promised that the Class Vehicles would perform adequately for a specified period of time or mileage, whichever came first.

210.    Defendant has breached and continues to breach its express warranties of future performance, thereby damaging Plaintiffs and Class members when their Class Vehicles fail to perform as represented due to an undisclosed paint defect. Defendant failed and refuses to fully cover or pay for necessary inspections, repairs, and/or vehicle replacements for Plaintiffs and the Class.

211.    Plaintiffs, members of the Class, and the public will suffer irreparable harm if Defendant is not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective paint, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

212.    Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

213.    Such irreparable harm includes but is not limited to likely damages as a result of the defects to the Class Vehicles.

214.    Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled. That relief is in excess of $5,000,000.00.

**COUNT FOUR**
**(Equitable and Injunctive Relief)**

215.    Plaintiffs, individually and for the Class, hereby incorporate by reference all paragraphs above as though fully restated herein.

216.     Plaintiffs, members of the Class, and the public will suffer irreparable harm if Defendant is not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective paint, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

217.     Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

218.     Such irreparable harm includes but is not limited to likely damages as a result of the defects to the Class Vehicles.

219.     Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled.

## COUNT FIVE
### (Unjust Enrichment)

220.     Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

221.     To the extent necessary, Plaintiffs bring this claim in the alternative.

222.     Defendant knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that the vehicles would perform as represented.

223.     Plaintiffs and the Class conferred substantial benefits on Defendant by purchasing the defective Class Vehicles. Defendant knowingly and willingly accepted and enjoyed those benefits.

224.    Plaintiffs and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the paint defect at the time of purchase or lease. Therefore, Defendant profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and Class Members.

225.    Defendant's retention of those benefits is inequitable.

226.    As a direct and proximate cause of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest. That relief is in excess of $5,000,000.00.

## COUNT SIX
### (Fraud, Omission, and Suppression Claim)

227.    Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

228.    Plaintiffs purchased or leased the Class Vehicles.

229.    Defendant concealed, omitted, and suppressed material facts concerning the quality of the Class Vehicles.

230.    Defendant concealed and suppressed material facts concerning the quality of the exterior paint used on the Class Vehicles.

231.    Defendant concealed and suppressed material facts that the paint defect causes Class Vehicles' exterior surfaces to become cloudy, peel, flake, microblister, delaminate, and bubble.  Defendant knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the latent defect prior to purchasing or leasing the vehicles.

232.    At all relevant times, Defendant had the duty and obligation to disclose to the Plaintiffs and Class the defects with the paint in the Class Vehicles. Defendant breached that duty by failing to disclose the issues with the defective paint and continuing to sell vehicles with the paint defect, despite knowledge of the issues.

233.    Defendant committed the foregoing acts and omissions in order to boost confidence in its vehicles and to falsely assure purchasers and lessees of

Defendant's vehicles that the Class Vehicles are world class, comfortable, warranted, and reliable vehicles, and it concealed the paint defect in order to prevent harm to Defendant and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the Plaintiffs' and each Class member's decisions to purchase or lease the Class Vehicles.

234.    Defendant had a duty to disclose the paint defect in the Class Vehicles because it was known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts; and Defendant knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class. Defendant also had a duty to disclose the facts because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality.

235.    As a result, the Plaintiffs and Class were misled as to the true condition of the Class Vehicles at purchase/lease and did not discover the paint defect until after the purchase/lease, at which time or shortly thereafter the Plaintiffs gave notice of the issues with the paint as alleged.

236.    The facts omitted and concealed by Defendant were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by the Plaintiffs and Class. Whether a manufacturer's products are as represented and backed by the manufacturer are material concerns to a consumer.

237.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense

of the Plaintiffs and Class.

238.    Had the Plaintiffs and Class known the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them.

239.    Because of the concealment and/or suppression of the facts, the Plaintiffs and Class suffered pecuniary injuries, including, but not limited to, loss of value, inconvenience, and repair costs.  Defendant's fraudulent concealment of the defect was the proximate cause of those losses.

240.    Additionally, Defendant omitted, suppressed, or concealed material facts of the defective paint used on the Class Vehicles, leading to the same result: first, had the Plaintiffs and Class been informed of the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them; and second, the Plaintiffs and Class suffered pecuniary injuries proximately caused by Defendant's suppression of the material facts of the defect, and those injuries include, but are not limited to, loss of value, inconvenience, and repair costs. Those injuries exceed $5,000,000.00.

## COUNT SEVEN
### (Strict Products Liability - Design Defect)

241.    Plaintiffs, individually and for the Class, hereby incorporate by all paragraphs above as though fully restated herein.

242.    Plaintiffs and the Class purchased or leased Class Vehicles in California.

243.    At all relevant times, the Defendant designed, manufactured, distributed, and/or sold the Class Vehicles.

244.    At all relevant times, the Defendant controlled the design, manufacturing and/ or distribution process for the Class Vehicles.

245.    As designed, manufactured, distributed, and/or sold by the Defendant, the Class Vehicles reached the Plaintiff and the Class, and were thereafter used by them without substantial change, in the condition in which they were distributed and sold.

246.    As distributed and sold, the Class Vehicles, or "products," are defective in design in that they do not and did not perform in the manner an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way. The products' failure to perform as expected was and is a substantial factor in economic harm suffered by Plaintiffs and the Class. That harm is conspicuous physical damage to the Class Vehicles, which are or were property of Plaintiffs and the Class.

247.    As a result of the products' failure to perform as expected, Plaintiffs and the Class have incurred and will incur significant economic loss.

248.    As a direct and proximate cause of the products' failure to perform as expected, and the damage to property that occurred due to that failure, Plaintiffs and the Class are entitled to damages in excess of $5,000,000.00 to compensate them for their economic loss.

## COUNT EIGHT
### (Violations of the Song-Beverly Act – Civ. Code § 1790, et seq.)

249.    Plaintiffs, individually and for the Class, hereby incorporate by reference all paragraphs above as though fully restated herein.

250.    Cal. Civ. Code § 1792 provides that, unless properly disclaimed, every sale of consumer goods is accompanied by an implied warranty of merchantability. Defendant did not at any time properly disclaim the warranty.

251.    The Class Vehicles are "consumer goods" under Cal. Civ. Code § 1791(a).

252.    Plaintiffs and Class Members are "buyers" and "lessees" under Cal.

Civ. Code §§ 1791(b) and (h). Defendant is the "manufacturer," "seller," and "lessor" of the Class Vehicles under Cal. Civ. Code §§ 1791(i), (j), and (l).

253.     Defendant knew of the particular purposes for which the Class Vehicles were intended and impliedly warranted to Plaintiffs and Class Members that the Class Vehicles were "merchantable" under Cal. Civ. Code §§ 1791.1(a) & 1792.

254.     The Class Vehicles are not merchantable, and as such Defendant breached its implied warranties because the Class Vehicles would not pass without objection in the automotive trade because they have defective paint.

255.     Plaintiffs and Class Members received the Class Vehicles in a condition which substantially diminishes their value. As a result of Defendant's failure to comply with its statutory obligations, Plaintiffs are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

256.     As a direct and proximate cause of the products' failure to perform as expected, and the damage to property that occurred due to that failure, Plaintiffs and the Class are entitled to damages in excess of $5,000,000.00 to compensate them for their economic loss.

## COUNT NINE
### (Violations of the Unfair Competition Law, or "UCL," Bus. & Prof. Code §§ 17200 et seq.)

257.     Plaintiffs, individually and for the Class, hereby incorporate by reference all paragraphs above as though fully restated herein.

258.     Plaintiffs and the Class purchased or leased Class Vehicles in California.

259.     The California UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

260.     The Defendant has engaged in unlawful, unfair and fraudulent business acts and practices in violation of the UCL in at least the following ways:

a. Defendant concealed and suppressed material facts concerning the quality of the Class Vehicles.

b. Defendant concealed and suppressed material facts concerning the quality of the exterior paint used on the Class Vehicles.

c. Defendant concealed and suppressed material facts that the paint defect causes Class Vehicles' exterior surfaces to become cloudy, peel, flake, microblister, delaminate, and bubble.

d. At the time of these acts, Defendant knew that Plaintiffs and the Class would not be able to inspect or otherwise detect the latent defect prior to purchasing or leasing the vehicles.

e. At all relevant times, Defendant had the duty and obligation to disclose to Plaintiffs and the Class the defects with the paint in the Class Vehicles. Defendant breached that duty by failing to disclose the issues with the defective paint and continuing to sell vehicles with the paint defect, despite knowledge of the issues.

f. Defendant committed the foregoing acts and omissions in order to boost confidence in its vehicles and to falsely assure purchasers and lessees of Defendant's vehicles that the Class Vehicles are world class, comfortable, warranted, and reliable vehicles, and it concealed the paint defect in order to prevent harm to Defendant and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decisions by the Plaintiffs and the Class to purchase or lease the Class Vehicles.

g. Defendant had a duty to disclose the paint defect in the Class Vehicles because it was known and/or accessible only to Defendant; Defendant had

superior knowledge and access to the facts; and Defendant knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the Class. Defendant also had a duty to disclose the facts because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality.

h. As a result of these acts and omissions by the Defendant, the Plaintiffs and the Class were misled as to the true condition of the Class Vehicles at purchase/lease and did not discover the paint defect until after the purchase/lease, at which time or shortly thereafter the Plaintiffs gave notice of the issues with the paint as alleged.

i. The facts omitted and concealed by Defendant were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by the Plaintiffs and Class. Whether a manufacturer's products are as represented and backed by the manufacturer are material concerns to a consumer.

j. Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiffs and Class.

k. Had the Plaintiffs and Class known the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them.

l. Because of the concealment and/or suppression of the facts, the Plaintiffs and Class suffered pecuniary injuries, including, but not limited to, loss of

value, inconvenience, and repair costs. Defendant's fraudulent concealment of the defect was the proximate cause of those losses.

m. Additionally, Defendant omitted, suppressed, or concealed material facts of the defective paint used on the Class Vehicles, leading to the same result: first, had the Plaintiffs and the Class been informed of the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them; and second, the Plaintiffs and the Class suffered pecuniary injuries proximately caused by Defendant's suppression of the material facts of the defect, and those injuries include, but are not limited to, loss of value, inconvenience, and repair costs. Those injuries exceed $5,000,000.00.

261.    At all times relevant, Defendant knew that it was designing, manufacturing, distributing, selling, and warranting Class Vehicles in California and throughout the United States that contained defective paint.

262.    The acts and omissions alleged were consistent with and part of the Defendant's scheme to profit from its design, manufacturing, distribution, and/or sale of the Class Vehicles, at the expense of Plaintiffs and the Class.

263.    The Plaintiffs and the Class could not have reasonably avoided injury from Defendant's unfair conduct.  At the time of purchase or lease, and thereafter until after the paint defect manifested and damaged the value of all Class Vehicles, Plaintiffs and the Class did not know of, and had no reasonable means of learning, the paint defect in the Class Vehicles.

264.    As a result, the Plaintiffs and Class were and are harmed, and Defendant's misleading statements and omissions are a substantial factor in causing that harm.

265.    Accordingly, Plaintiffs and the Class have suffered injury in fact including lost money as a result of Defendant's unlawful, unfair and fraudulent

business practices.

266.     Plaintiffs and the Class seek to enjoin further unlawful, unfair and fraudulent acts or practices by Defendant under Bus. & Prof. Code § 17200.

## COUNT TEN
### (Violations of California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq)

267.     Plaintiffs, individually and for the Class, hereby incorporate all paragraphs above as though fully set forth herein.

268.     Defendant's violations of the CLRA occurred repeatedly in its trade or practice—including design, manufacture, distribution, marketing, sale, and lease of the Class Vehicles with defective paint.

269.     Defendant, through its agents, employees, and/or subsidiaries, violated the CLRA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality and performance of the Class vehicle defective paint as detailed above.

270.     Defendant had an ongoing duty to Plaintiffs and Class Members to refrain from unfair or deceptive practices under the CLRA in the course of its business. Specifically, Defendant owed Plaintiffs and the Class Members a duty to disclose all the material facts concerning the Defective Paint in the Class Vehicles because:

    a. Given Defendant's role in the design, manufacture, testing, and sale of Class Vehicles with defective paint, and its experience and knowledge as experts and long-time veterans of the automotive industry, Defendant possessed exclusive access to and was in a superior position to know the true facts about the defective paint;

    b. Given the paint defect's hidden, latent, and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle paint and technology that would be necessary to discover the paint defect on their own before the peeling, cracking, and cloudiness became apparent;

c. Defendant knew about and investigated the paint defect, but did not notify consumers about it or disclose the defect to its authorized dealerships, all of which deprived Plaintiffs of an opportunity that otherwise could have led them to discover the truth about the defective paint in their Class Vehicles;

d. Defendant made or conspired to make incomplete representations about the quality of the Class Vehicles' paint, while purposefully withholding material facts about a known paint defect. Because Defendant volunteered to provide information about the Class Vehicles that it marketed and offered for sale and lease to consumers, Defendant had the duty to disclose the whole truth.

271.     By misrepresenting the Class Vehicles as of a particular quality, grade, and standard as detailed above when, in fact, they were not of that quality, grade, or standard, and/or by failing to disclose and actively concealing the defective paint, Defendant engaged in the unfair or deceptive business practice as defined in Cal. Civ Code § 1770(a)(7).

272.     Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles were of a particular quality, grade, and standard. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class Members, about the true quality of the Class Vehicles and the true value of the Class Vehicles.

273.     Defendant intended for Plaintiffs and Class Members to rely on its misrepresentations, omissions, and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have defective paint.

COMPLAINT                          64

274.     Defendant's misrepresentations, concealments, omissions, and suppressions of material facts regarding the paint defect were material to the decisions of Plaintiffs and Class Members to purchase and lease those vehicles, as Defendant intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendant's misrepresentations that the Class Vehicles were of a particular quality, grade, and standard and free of defect in deciding to purchase and lease the Class Vehicles.

275.     Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiffs and Class Members did not, and could not, unravel Defendant's deception on their own until the peeling, cracking, and cloudiness became apparent in their Class Vehicles.

276.     Had they known the truth about the paint defect, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

277.     As a direct and proximate result of Defendant's deceptive practices, Plaintiffs and Class members have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendant's actions and omissions alleged above.

278.     Plaintiffs and Class members provided Defendant notice of the issues raised in this count and this Complaint and an opportunity to cure pursuant to Cal. Civ. Code § 1782.

279.     Plaintiffs and Class members seek an order enjoining the above

deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the CLRA against Defendant.

## COUNT ELEVEN
### (Violations of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.)

280.    Plaintiffs, individually and for the Class, hereby incorporate the paragraphs above as though fully set forth herein.

281.    In the course of its business, Defendant, through its agents, employees, and/or subsidiaries, violated the California FAL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality of the Class Vehicles' paint and the paint defect, as detailed above.

282.    Defendant had an ongoing duty to Plaintiffs and Class members to refrain from unfair or deceptive practices under the California FAL in the course of its business. Specifically, Defendant owed Plaintiffs and Class members a duty to disclose all the material facts concerning the paint defect in the Class Vehicles because:

a. Given Defendant's role in the design, manufacture, testing, and sale of Class Vehicles with defective paint, and its experience and knowledge as experts and long-time veterans of the automotive industry, Defendant possessed exclusive access to and was in a superior position to know the true facts about the defective paint;

b. Given the paint defect's hidden, latent, and technical nature, Plaintiffs and Class Members lack the sophisticated expertise in vehicle paint and technology that would be necessary to discover the paint defect on their own before the peeling, cracking, and cloudiness became apparent;

c. Defendant knew about and investigated the paint defect, but did not notify consumers about it or disclose the defect to its authorized dealerships, all

of which deprived Plaintiffs of an opportunity that otherwise could have led them to discover the truth about the defective paint in their Class Vehicles;

d.  Defendant made or conspired to make incomplete representations about the quality of the Class Vehicles' paint, while purposefully withholding material facts about a known paint defect. Because Defendant volunteered to provide information about the Class Vehicles that it marketed and offered for sale and lease to consumers, Defendant had the duty to disclose the whole truth.

283.    By misrepresenting the Class Vehicles as a certain quality, grade, and standard, and by failing to disclose and actively concealing the paint defect, Defendant engaged in untrue and misleading advertising prohibited by California Bus. & Prof. Code § 17500.

284.    Defendant made or caused to be made and disseminated throughout California advertising, marketing, labeling, and other publications containing numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care they should have been known to be untrue and misleading to consumers, including Plaintiffs and Class members.

285.    Defendant's unfair or deceptive acts and practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles' paint was of a quality, grade, and standard and not defective. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiffs and Class members, about the quality of the Class Vehicles' paint and the true value of the Class Vehicles.

286.    Defendant intended for Plaintiffs and Class members to rely on their

misrepresentations, omissions, and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would have paint of a certain quality, grade and standard.

287.    Defendant's misrepresentations, omissions, and concealment of material facts regarding the paint defect were material to the decisions of Plaintiffs and Class members to purchase and lease those vehicles, as Defendant intended. Plaintiffs and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendant's misrepresentations and omissions that Class Vehicles were of a quality, grade, and standard in deciding to purchase and lease those vehicles.

288.    Plaintiffs' and Class members' reliance was reasonable, as they had no way of discerning that those representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own.

289.    Had Plaintiffs and Class members known the truth about the paint defect, they would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

290.    Plaintiffs and Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

291.    Plaintiffs and Class Members seek an order enjoining Defendant's false advertising, any such orders or judgments as may be necessary to restore to Plaintiffs and Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the false advertising provisions of the California FAL.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly

situated, request an order and judgment against Defendant which –

1.    Certifies the Class and appoints Plaintiffs and their counsel to represent the Class.

2.    Awards compensatory damages to Plaintiffs and Class in the utmost amount allowed by law.

3.    Awards punitive damages against the Defendant in favor of Plaintiffs and Class in the utmost amount allowed by law.

4.    Grant injunctive and equitable relief as may be appropriate.

5.    Awards a reasonable attorneys' fees to Plaintiffs and Class, as prescribed by law and for the common and public good obtained in this action.

6.    Grants such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR A JURY TRIAL

Plaintiffs and the Class hereby demand a trial by struck jury on all issues.

Dated this 9th day of July 2024.

Respectfully submitted,            **INSIGHT, PLC**

*/s/ Steven W. Ritcheson*
Steven W. Ritcheson

Taylor C. Bartlett (pro hac vice to be filed)
Jeanie Sleadd (pro hac vice to be filed)
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone:   (205) 326-3336
Facsimile:   (205) 326-3332
taylor@hgdlawfirm.com
jeanie@hgdlawfirm.com

*Attorneys for Plaintiffs*

COMPLAINT                                    69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT